## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, David Kukura, being duly sworn, depose and state as follows:

1.     I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI), currently assigned to the Knoxville Division, Chattanooga, Tennessee Resident Agency. I have been employed as a Special Agent for over 29 years. I have participated in investigations into federal criminal violations related to financial crimes, criminal enterprise, human trafficking, and crimes against children. I have received formal training and have participated in numerous search warrants in a variety of investigative matters. As a federal agent, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with the authority to execute warrants issued under the authority of the United States.

2.     The statements contained in this affidavit are based upon my investigation, information provided by other law enforcement agencies and partners, and on my experience and training as a Special Agent of the FBI. Because this affidavit is being submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that evidence of a violation of interstate commerce, Title 18, United States Code, Sections 2252(a)(4)(B) and 2252A(a)(5)(B), which make it a crime to possess child pornography.

3.     This affidavit is being submitted in support of an application for a search warrant to search a Hewlett Packard Laptop Computer, Western Digital Hard Drive, SD cards, and digital

1

field cameras seized from Vincent Garner for evidence of child pornography, which is more fully described in Attachment A of this affidavit.

4.     This affidavit will show there is probable cause that items related to the violations being investigated (as specifically described in Attachment A, attached hereto and incorporated herein) will be found within the seized Hewlett Packard Laptop Computer, Western Digital Hard Drive, SD cards, and digital field cameras.

## APPLICABLE LAW

5.     Title 18, United States Code, Sections 2252(a)(4)(B) and 2252A(a)(5)(B), make it a federal crime for any person to knowingly possess any material that contains an image of child pornography that has been mailed, or shipped, or transported in interstate foreign commerce by any means, including by computer, or that was produced using materials that have been mailed, or shipped, or transported in interstate or foreign commerce by any means, including by computer. "Child Pornography," as used herein, is defined in 18 U.S.C. § 2256(8) as any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct. "Minor" means any person under the age of eighteen years.  See 18 U.S.C. § 2256(1). "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c)

2

masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic area of any person. See 18 U.S.C. § 2256(2).

6.     As is the case with most digital technology, communications by way of computer can be saved or stored on the computer used for these purposes. In addition to electronic communications, a computer user's Internet activities generally leave traces in the web cache and history files of the browser used along with stored images.

## THE INVESTIGATION

7.     Vincent Garner and others were subjects of an FBI investigation. On November 13, 2015, U.S. Magistrate Judge Christopher H. Steger signed a federal search warrant authorizing the search of Garner's residence for evidence related to the purchase and sale of narcotics, firearms, and ammunition. Computers, laptops, peripheral devices, other devices capable of storing data, computer hardware, software, flash drives, and thumb drives were included in the items listed in the warrant and attachments to be seized and searched. This warrant was executed at Garner's residence located at 186 51st Avenue, Gruetli Laager, Tennessee on November 19, 2015. Pursuant to the warrant, Agents seized, among other things, an HP laptop computer, field cameras and SD cards.

8.     On January 5, 2016, the FBI's Computer Analysis Response Team (CART) began its physical examination of the computer. By January 8, 2016, forensic images of the computer, the internal Western Digital hard drive, as well as the SD cards were created, and the data was extracted and preserved for a forensic review.

9.     Vincent Garner was indicted by a federal grand jury sitting in Chattanooga, Tennessee on July 26, 2016, under Docket No. 1:16-cr-90, for manufacturing more than 1,000 marijuana

plants, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A) (Count One); distributing marijuana, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D) (Count Two); being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(l) (Counts Three and Six); manufacturing more than 100 marijuana plants, in violation of 21 U.S.C. § 841(a)(1) and (b)(l)(C) (Count Four); possessing a firearm during in relation to a federal drug trafficking crime, in violation of 18 U.S.C. § 924(c) (Count Five). A federal arrest warrant was issued by the Clerk of Court on the same date.

10.     Vincent Garner remained unapprehended until July 2019, when Special Agents of the Federal Bureau of Investigation (FBI) located Vincent Garner at 7727 Highway 111, Dunlap, Tennessee. On July 16, 2019, a Federal Search Warrant signed by United States Magistrate Judge Christopher Steger was obtained in order to arrest Garner in the residence of 7727 Highway 111, Dunlap, Tennessee. Garner was arrested outside of the residence and therefore the Federal Search Warrant was not executed.

11.     Following Garner's apprehension and arrest, an additional re-processing and forensic review was performed of the data taken from Garner's HP laptop using newer versions of forensic software tools. At that time, evidence of child pornography was discovered. A deleted image was found depicting a female who appears to be under the age of 12 performing oral sex on an adult male, that is, the image depicts an adult male inserting his erect penis into the mouth of a female who appears to be under the age of 12. Upon this discovery, the forensic review was halted in order to request a search warrant specifically authorizing the search for the presence of additional child pornography. The affidavit that accompanied the original search warrant described in paragraph 7 is attached (See

4

Attachment B) and is realleged and incorporated herein as if fully stated within this paragraph. The affiant to this affidavit and to the affidavit in the original search warrant is the same.

12.    The aforementioned HP laptop computer, Western Digital hard drive, and all electronic data removed therefrom, are currently located at the FBI's Knoxville, Tennessee headquarters, where they have been located and securely stored since the initial forensic digital image of the computer's hard drive was created in January 2016.

## CONCLUSION

13.    Based upon information provided in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 2252 and 2252A have been committed and that the items described in Attachment A, attached hereto and incorporated will be found and will constitute evidence of violations against the laws of the United States contained within Vincent Garner's Hewlett Packard laptop computer, Western Digital Hard Drive, SD cards, and digital field cameras.

David Kukura, Special Agent
Federal Bureau of Investigation

Subscribed and Sworn to before
this 4th day of November, 2019

Christopher H Steger

5

1. The seized Hewlett Packard Laptop Model 2000-2d19WM SN: 5CG34512NC, including the Western Digital Hard Drive SN: WX81E73NZEE6 contained therein, as well as the SD cards and digital field cameras seized pursuant to the warrant executed on November 19, 2015 referenced in paragraph 7 of the affidavit in support of the search warrant, all of which is currently located at the Federal Bureau of Investigation Knoxville Division Computer Forensics Lab.

# Attachment B

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF 186 51st Avenue, Gruetli Laager, Tennessee, 37339. | Case No. 1-15-mj-314 |
| | **Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, David Kukura, being first duly sworn under oath, states that the following is true and correct to the best of his knowledge:

## INTRODUCTION AND AGENT BACKGROUND

1. I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been so employed for over 26 years. I am a Certified Public Accountant, and prior to joining the FBI, I worked for a public accounting firm. As a Special Agent, my duties and responsibilities have included conducting criminal investigations of individuals and business entities for possible violations of federal laws, particularly those laws found in Title 18, United States Code. From November 1989 to June 2015, I was assigned to the FBI's Minneapolis, Minnesota, office, during which time I was assigned to a White Collar Crime squad with responsibility for investigating violations such as Mail Fraud, Fraud By Wire, Fraud Against the Government, and Money Laundering, and I also assisted other Agents with illegal narcotics investigations. Since July 2015, I have been assigned to the FBI's Chattanooga, Tennessee, office where I have been assigned to work primarily on White Collar Crime investigations. I have participated in the execution of numerous search warrants for documents, records, and proceeds from illegal activities and have participated in the subsequent investigation and analysis of evidence seized pursuant to those warrants. In virtually all cases, evidence in the form of records was found in

the place of the subject's residence and/or place of business. I have also had experience interviewing defendants, witnesses, informants, and other persons who have had personal knowledge of the amassing, spending, converting, and concealing of proceeds gained from illegal activity.

2. Since arriving in Chattanooga, I have also been assigned to assist FBI Special Agent Cathleen Fuller in an investigation of Vincent Garner who is operating an illegal marijuana grow operation from his residence located at 186 51st Avenue, Gruetli Laager, Tennessee, 37339.

3. This affidavit is submitted in support of a search warrant for the buildings, vehicles, and premises, including but not limited to the house, sheds, buildings, cars, trucks, trailers, other vehicles, and all other structures, located at 186 51st Avenue, Gruetli Laager, Tennessee, 37339, along with all computer storage media, equipment, and software necessary to retrieve the media. 186 51st Avenue, Gruetli Laager, Tennessee, is further described as a brownish brick one-story house. Behind the house are two wooden buildings. Other vehicles and two carports are also located on the property. A photograph and google earth image of the residence is attached to this affidavit as Attachment A.

4. Based on my training and experience, information provided to me by other FBI Agents and law enforcement personnel, my background as a Special Agent for the FBI, and the facts set forth below, I have probable cause to believe that:

a. Vincent Garner, who resides at 186 51st Avenue, Gruetli Laager, Tennessee, 37339, has committed violations of Title 21, United States Code, Section 841(a)(1), and Title 18, United States Code, Sections 922(g)(1) and 924(c) by engaging in an illegal marijuana grow operation at his residence and possessing firearms;

b. evidence, fruits, and instrumentalities of the violations exist within the location described in paragraph 3 above; and these items will assist investigators assigned to this matter determine the extent and scope of the criminal activity.

5. Unless otherwise noted, the information contained in this affidavit is based on my personal participation in the investigation of the above-described offenses, on information provided to me by other FBI Agents and law enforcement personnel, and on my experience and background. Since this affidavit is submitted for the purpose of securing a search warrant, it does not contain every fact known to me concerning this investigation.

<u>Probable Cause</u>

6. A Cooperating Witness (CW) has been providing the FBI with information about Garner's marijuana grow operation. Agent Fuller and I have met with the CW on numerous occasions, and the CW informed us that Garner grows marijuana at his residence in Gruetli Laager, Tennessee. In September 2014, the CW made a successful controlled purchase of marijuana from Garner on behalf of law enforcement. Many of the CW's observations in the instant investigation have been corroborated by the CW's consensually recorded audio and video recordings on behalf of law enforcement.

7. On October 15, 2015, the CW made a consensual audio/video recording of a meeting with Garner. Garner picked up the CW in his truck, and then drove the CW to his residence located at 186 51st Avenue, Gruetli Laager, Tennessee. Agent Fuller and I have spoken to the CW about the meeting, and we have watched the audio/video recording of the meeting. While in the house, Garner talked about growing marijuana. At one point the CW was looking at a copy of "High Times" magazine which Garner had in his residence. The magazine included advertisements for marijuana growing supplies and equipment, and Garner told the CW that

lights and fans can be controlled by computer. Garner also took the CW to a wooden building behind his house to show the CW his marijuana grow operation. A still image photograph taken from the video recording by the CW is attached to this affidavit as Attachment B. On the video, marijuana plants and the instrumentalities of a marijuana grow operation, such as lights, fans, and an air conditioner, are visible; and at one point, Garner can be seen trimming and cutting the marijuana plants. The CW estimates that there were approximately 30 plants in the building. During the meeting, Garner told the CW (inter alia):

    a. "I'm a pot grower. I'm gonna grow pot."

    b. he is growing two different types of marijuana plants;

    c. in addition to selling marijuana, Garner is selling Percocet, which he described as oxycodone.

    8. The CW advised Agent Fuller and your affiant that there is a two car carport adjacent to Garner's residence, and behind the house are two wooden buildings and another carport. One of these wooden buildings contains the marijuana grow operation which Garner showed to the CW. According to the CW, inside this wooden building there are lights, fans, chemicals, watering and exhaust systems, and other equipment associated with the manufacture of marijuana. The CW further advised that Garner has a laptop in his residence, and uses his vehicle to make deliveries of marijuana from his residence to customers. The CW also stated that he stores marijuana in plastic totes.

    9. According to NCIC records, Garner's criminal history reflects a 1993 Federal conviction for armed bank robbery and using a firearm during a crime of violence, and a 2003 Federal conviction for conspiracy to distribute marijuana.

10. On November 11, 2015, the CW consensually recorded a conversation with Garner, and during this conversation, Garner told the CW that he went hunting the previous day and shot a deer.

11. I have spoken to other law enforcement officers who have experience investigating and interviewing individuals involved in the use, manufacture, trafficking, and distribution of controlled substances. These officers have informed me that:

a.  marijuana growing operations – much like ordinary farming -- are long term endeavors requiring stable growing locations and utilization of fixed buildings and other equipment that manufacturers – unlike ordinary farmers -- attempt to shield from external observation.

b.  when controlled substances are illegally used, manufactured, and trafficked in, other supporting items and materials are usually present in addition to the controlled substances themselves.  These supporting items commonly associated with the use of and traffic in controlled substances include, but are not limited to drug paraphernalia; scales and packaging materials suitable for particular substance(s); records and notes of controlled substance transactions; money (proceeds of or capital for controlled substance transactions); weapons (used to protect the controlled substance(s) or proceeds); electronic devices suitable for use in controlled substance transactions, recordings of such transactions, or electronic devices suitable for avoiding law enforcement.

c.  users of and traffickers in controlled substances, when hiding or transporting controlled substances or cash, commonly conceal them in several separate "stashes", often in several rooms

of a building, outbuilding, several vehicles and in public or common areas which can be kept under their observation.

d. growers of indoor marijuana need to utilize equipment such as fans, lights, timers, watering systems, heating systems, exhaust/ventilation systems, air conditioners, and generators. This equipment is essential to growers in an attempt to create an outdoor environment, indoors. Certain equipment cannot be purchased at any commonly used store. Due to this fact, many of the growers have to either physically travel to a store specializing in this equipment, or order this equipment via computer from an on-line store and have it shipped to a location. Many of these type stores advertise in marijuana grow literature like "High Times" or "Cannabis Culture".

e. individuals dealing in the manufacture and distribution of controlled substances and illegal narcotics frequently possess – on their persons, in their residences, or other locations over which they exercise dominion and control, including vehicles – firearms, ammunition and other weapons, both legal and illegal, in order to protect their person, their criminal operations and proceeds, and to intimidate others.

f. individuals dealing in the manufacture and distribution of controlled substances and illegal narcotics maintain books, records, customer lists, receipts, notes, ledgers, and other records, often for extended periods of time, relating to the manufacture, transportation, ordering, sales, and distribution of controlled substances and equipment, even though such documents may be in code. These individuals also maintain names, addresses, telephone numbers, and contact information for suppliers and customers in cellular telephones, PDAs, computers, and other communication devices and digital devices. These individuals often maintain photographs of themselves and co-conspirators, as well as photographs of their drugs, money, or things of

value purchased with illegal proceeds. These individuals commonly maintain these records, photographs, and other items in locations where they have dominion and control, and where they have ready access to these records and other items, such as at their residence and "stash" locations.

g. individuals dealing in the manufacture and distribution of controlled substances and illegal narcotics often keep paraphernalia for manufacturing, packaging, cutting, weighing, distributing, and protecting the substances/narcotics where they have dominion and control, such as their residence, "stash" locations, or inside their vehicles. Such paraphernalia often includes bottles, scales, plastic bags, heat sealers, guns, and other weapons. These items are kept at these locations for fast and convenient access and as a result of the packaging and drug trafficking activities which take place at these locations.

h. individuals dealing in the manufacture and distribution of controlled substances and illegal narcotics must maintain, on hand, cash and currency in order to maintain and finance their on-going activities;

12. As stated above, Garner drove the CW to his residence located at 186 51st Avenue, Gruetli Laager, Tennessee, 37339. Garner brought the CW into his house where he had marijuana grow literature, and showed the CW a marijuana grow operation located in a wooden building on the property behind the house.

Occupancy and Description of Location and Property to be Searched

13. On 11/19/2015, the CW provided Agent Fuller and me with a photograph of Garner's house located at 186 51st Avenue, Gruetli Laager, Tennessee, which is described as a brownish

brick one-story house. Adjacent to the house is a two car carport, and behind the house are two wooden buildings and another carport. Agent Fuller and I showed an aerial image of 186 51st Avenue to the CW, who confirmed that it was Garner's property. Your Affiant submits that probable cause exists to believe that Vincent Garner, has been in possession of numerous controlled substances, drug trafficking paraphernalia, ledgers, and documentary evidence of illegal activity, and is using the residence located at 186 51st Avenue, Gruetli Laager, Tennessee, to store these items. Your Affiant further submits that probable cause exists to have the residences/properties of 186 51st Avenue, Gruetli Laager, Tennessee, located in the Eastern District of Tennessee, searched for the items listed within this affidavit and in Attachment C, which constitute any and all other material evidence of violations of 21 U.S.C. §§ 841 which include manufacturing, possession with intent to distribute and distribution of controlled substances, and violations of 18 U.S.C. §§ 922 and 924, which include possession of a firearm by a prohibited person and possession of a firearm in furtherance of a drug trafficking crime.

14. Search methodology: computers

a. Because this warrant requests permission to search any seized computer(s) or computer-related materials as defined below, a technician specially trained in the use and retrieval of information from computers will assist law enforcement with their search of any computer(s), peripherals, computer storage devices, and computer-related equipment. It is believed the computer(s) will contain both evidence of criminal activity, as well as be an instrumentality of the crime itself.

b. Searching computerized information for evidence of crime commonly requires the conservation of most of the computer hardware, software, documentation, and data security

devices (including passwords and encryption keys) so that a qualified computer expert can accurately retrieve the system's data in a laboratory or other controlled environment. The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain; "opening" or reading the first few "pages" of files in order to determine their precise contents; skimming the remainder of files in order to ensure nothing relevant is contained within an apparently irrelevant file, "scanning" storage areas to discover and possibly recover recently deleted data; "scanning" storage areas for deliberately hidden files; or performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation. This is true because of the following:

    c. The volume of evidence: Computer storage devices (like hard disks, diskettes, tapes, thumb/flash drive, laser disks, Jaz, Zip and Bernoulli drives) can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of a crime. This sorting process can take weeks or months, depending on the volume of data stored.

    d. Technical requirements: Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize

in some systems and applications, so it is difficult to know before a search which expert is qualified to analyze the system and its data. In any event, however, data search protocols are exacting scientific procedures designed to protect the integrity of the evidence and to recover even "hidden," erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to inadvertent or intentional modification or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap") a controlled environment is essential to its complete and accurate analysis.

e. Data analysis may use several different techniques to search electronic data for evidence or instrumentalities of a crime. These include, but are not limited to the following: examining file directories and subdirectories for the lists of files they contain, "opening" or reading the first few "pages" of a selected files to determine their contents, scanning for deleted or hidden data, searching for key words or phrases ("string searches").

15. In view of the foregoing, your Affiant seeks permission to search any and all computer hardware, software, documentation, storage devices, electronically stored data, and passwords and data security contained within any computer or computer-related materials seized, as described below:

a. "Hardware" - Computer hardware consists of any and all computer equipment capable of being linked together in a local area network (LAN) (to include any equipment which has remote access capabilities) including all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data. Hardware includes (but not limited to) any data-processing devices (such as central processing units, and self-contained "laptop" or "notebook" computers); internal and peripheral

storage devices (such as fixed disks, external hard disks, floppy disk drives and diskettes, thumb drives/flash drives, compact flash cards, tape drives and tapes, optical storage devices, and other memory storage devices); peripheral input/output devices (such as keyboards, printers, scanners, plotters, video display monitors, and optical readers); and related communication devices (such as modems, cables and connections); as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (such as physical keys and locks).

b. "Software" - Computer software is digital information which can be interpreted by a computer and any related components to direct the way they work. Software is stored in electronic, magnetic, optical, or digital form. It commonly includes programs to run operating systems, applications (like work-processing, graphics, or spreadsheet programs), utilities, compilers, interprets, and communications programs.

c. "Documentation" - Computer-related documentation consists of written, recorded, printed, or electronically stored material which explains or illustrates how to configure or use computer hardware, software, or other related items.

d. "Electronically Stored Data" - Any and all such data concerning counterfeit/false identification documents and any all such data consisting information stored on back-ups tapes, on computer hard drives, and/or any other form or manner.

e. "Passwords and Data Security" - Computer passwords and other data security devices are designated to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming codes. A password (a string of keyboard characters) usually operates as a sort of digital key to "unlock" particular data security devices, chips, and circuit boards. Data security software or digital code may include

programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the process to restore it.

16. As a result of the foregoing, the Court's permission is requested to seize the computer(s), computer hardware and software, peripherals, computer storage devices, and computer-related equipment that are believed to contain some or all of the evidence described in the "Items To Be Seized" and to conduct an offsite search. The amount of electronic media, technical issues, encrypted data and unique equipment/software may impact on the exact amount of time that it may require to acquire and test images, both on-site and off-site.

17. Appropriately trained personnel will search any computer(s), computer hardware and software, peripherals, computer storage devices, security devices, and computer-related equipment for any evidence of the scheme described in the foregoing paragraphs. If, after inspecting the input/output peripheral devices, system software, and pertinent computer related documentation, it becomes apparent that these items are no longer necessary to retrieve and preserve the evidence - and are not an instrumentality of a crime -- such materials and/or equipment will be returned within a reasonable time.

<u>Conclusions</u>

18. Based on all the forgoing information, probable cause exists to believe that evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1) and Title 18, United States Code, Sections 922(g)(1) and 924(c) exist within the premises, buildings,

structures, vehicles, computers, computer storage media and equipment, and software necessary

to retrieve the media, located at 186 51st Avenue, Gruetli Laager, Tennessee, 37339.

_____

David Kukura, Special Agent
Federal Bureau of Investigation


SUBSCRIBED and SWORN to before me
this 13rd day of November, 2015

_____

Christopher H. Steger
United States Magistrate Judge

## ATTACHMENT A

Description of place to be searched:

186 51st Avenue, Gruetli Laager, Tennessee, 37339
further described as a brownish brick one-story house





## ATTACHMENT B



ATTACHMENT C

Items to be Seized

The items to be seized are evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Section 841(a)(1); Manufacture and Possession with Intent to Distribute Marijuana; specifically:

1. Documents showing ownership of, residency at, or control of the premises, including, but not limited to telephone bills, rent receipts, keys, utility company bills/receipts, papers, documents, letters, and envelopes;

2. Proceeds of the manufacture, distribution, or sale of controlled substances or illegal narcotics, and/or other criminal activity, including currency or other monetary instruments;

3. For the period January 1, 2014, to the present, financial records including bank and financial account statements, tax returns, documents and items utilized in the preparation of tax returns, receipts, invoices, ledgers, notes, and other documents or items reflecting or related to the receipt, location, distribution, transfer, and/or concealment of assets, money, or to other things of value;

4. Safe deposit box keys, codes, and records, money containers, safes;

5. Money counting machines, money wrappers;

6. Surveillance cameras, monitors, radio frequency detectors, and other anti-surveillance devices capable of being used to monitor police activity and to thwart police investigations;

7. For the period January 1, 2014, to the present, records, receipts, contracts, or items tending to identify off-site storage locations;

8. Firearms, ammunition and firearm accessories, including, but not limited to, scopes, shells, shell casings, magazine clips, silencers, and ammunition boxes;

9. Computers, laptops, peripheral devices, other devices capable of storing data, cellular telephones, PDAs, flash drives, thumb drives, computer hardware, software, documentation, other storage devices, electronically stored data, encryption devices, passwords and data security contained within any computer or computer-related items or materials, and any other items necessary to gain access to data stored on devices or storage media;

10. Books, records, receipts, notes, magazines, and other documents, records, or items related to the manufacture, ordering, shipment, distribution and/or sale of controlled substances and equipment, even though they may be in code, including records or other items tending to identify transactions, sources, and customers, such as ledgers, buyer lists, seller lists, receipts, and notes;

11. Items tending to identify others involved in the manufacture, distribution, and/or sale of controlled substances, including, but not limited to personal telephone books, address books, telephone bills, photographs, videos, and other documents, records or items reflecting names, addresses, telephone numbers, and communications with suppliers, customers, and/or co-conspirators;

12. Keys and codes for storage facilities, locks, and luggage;

13. Controlled substances or illegal drugs, including but not limited to, marijuana, Percocet, and oxycodone:

14. Paraphernalia, equipment, and other items for the use, manufacture, distribution, packaging, weighing, and sale of controlled substances or illegal drugs; including but not limited to, pipes, syringes, rolling papers, fans, lights, irrigation/watering systems, exhaust systems, generators, exhaust systems, heating and cooling systems, chemicals, plastic bags, other packaging and sealing materials, pots, and soil.